852 F.2d 568
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Ina M. EVANS, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH & HUMAN SERVICES, Defendant-Appellee.
 No. 87-3737.
 United States Court of Appeals, Sixth Circuit.
 July 14, 1988.
 
 Before BOYCE F. MARTIN, Jr., MILBURN and RALPH B. GUY, Jr., Circuit Judges.
 PER CURIAM.
 
 
 1
 Claimant Ina M. Evans appeals from the judgment of the district court granting the Secretary's motion for summary judgment and denying her claim for disability benefits. For the reasons that follow, we affirm.
 
 I.
 
 2
 This case comes before us on the basis of a rather convoluted procedural record. Claimant initially filed an application for disability insurance benefits on January 7, 1982, alleging that she became disabled on April 11, 1981, due to a back injury. Claimant's insured status expired on June 30, 1982. Her application was denied initially and upon reconsideration, and a de novo hearing was held before an Administrative Law Judge on September 8, 1982.
 
 
 3
 At the administrative hearing, claimant presented medical evidence regarding her back injury. On April 16, 1981, claimant was admitted to Good Samaritan Hospital in Cincinnati, Ohio, complaining of left hip and leg pain of approximately ten weeks duration. Although she recalled no precipitating trauma, she did indicate that she fell after slipping on some grease when employed in a restaurant in 1978. Although she experienced some lower back pain immediately following the episode, the pain eventually subsided.
 
 
 4
 Dr. Hunter, claimant's treating neurosurgeon, indicated that claimant suffered from a herniated intervertebral disc at L5-S1 with acute compression of the first sacral nerve root. After further testing to confirm this diagnosis, Dr. Hunter performed a lumbar partial hemilaminectomy at L5-S1 on the left side. Dr. Hunter reported that claimant's postoperative convalescence was entirely uneventful and that claimant was discharged from the hospital symptomatically improved, without leg pain, on April 24, 1981. On April 27, 1981, claimant's sutures were removed, and the wound was healing well. No other significant abnormalities were noted during this hospitalization, although claimant's blood pressure was 152/80.
 
 
 5
 On June 26, 1981, claimant returned for a follow-up evaluation and told Dr. Hunter "that she was doing quite well." J.A. at 93. Although claimant was not active and complained of no pain, she reported that she had some discomfort in the left hip and the top of the left foot with increased activity. Dr. Hunter also noted some sensory impairment over the first sacral dermatome on the left and the absence of a left ankle reflex. There was no restriction of straight leg raising. Claimant was placed on Zomax 100 for pain.
 
 
 6
 On August 26, 1981, claimant complained of burning in her left hip and leg. She was placed on flexion exercises and provided with a prescription for Soma Compound. On November 9, 1981, she reported the same complaints. Accordingly, her medication was adjusted.
 
 
 7
 On March 15, 1982, claimant returned to Dr. Hunter, complaining of left hip and leg pain, but no back pain. She reported a tingling in the outer three toes of the left foot. Once again, the left ankle reflex was absent, there was sensory impairment over the first sacral dermatome on the left, and there was no restriction of straight leg raising.
 
 
 8
 On April 13, 1982, claimant again returned to Dr. Hunter, stating that until the day before, she "had been doing quite well with no back pain." J.A. at 101. However, the previous day she experienced a flare-up after bending forward to place her small grandson on the floor. Examination revealed mild restriction of straight leg raising on the left, and Dr. Hunter instructed claimant to return for a follow-up evaluation.
 
 
 9
 On two occasions, Dr. Hunter rendered opinions regarding claimant's ability to work. On April 23, 1982, in response to an inquiry by claimant's attorney, Dr. Hunter stated that "Mrs. Evans' problems have indeed affected her ability to work, and she has been totally disabled since February of 1981." J.A. at 102. However, on July 15, 1982, in response to a detailed inquiry describing work at the sedentary level, Dr. Hunter responded that claimant could, in fact, perform such work. J.A. at 111.
 
 
 10
 Dr. Sally Taylor is claimant's family physician. In a transcription dated February 5, 1982, Dr. Taylor stated that she first examined claimant in March 1981. At that time, claimant complained of pain from her left buttock radiating into the left leg. Claimant had been experiencing this pain for approximately one month, and had seen a chiropractor with no success. Dr. Taylor prescribed Butazolidin and Fiorinal and requested that claimant return in two weeks. Claimant's blood pressure was 170/104, but it was not treated at that time because Dr. Taylor believed the elevated blood pressure level might be related to claimant's pain.
 
 
 11
 When claimant returned two weeks later, her blood pressure was 190/108. She still complained of pain in her hip. When claimant returned after another two weeks, her blood pressure had dropped to 164/92. However, she had gained four pounds, and her weight was 173 pounds. Because claimant's back pain was increasing, she reported to the Good Samaritan emergency room, and her back surgery followed. Dr. Taylor saw claimant last on May 18, 1981, and reported that her blood pressure was 140/90. Although claimant was still having some pain in her legs, it was not as great as before the surgery. Because Dr. Taylor had not seen claimant since May 1981, she could only conclude that claimant was being treated by Dr. Hunter.
 
 
 12
 On February 22, 1982, claimant was examined by Dr. Robert L. Swartzel. Dr. Swartzel reported that claimant was mildly obese and appeared in no acute distress. Claimant possessed a normal gait and a well-healed, nonadherent, nontender scar over the lumbosacral spine. Although claimant was unable to stand on her toes, she had no trouble reaching overhead, grasping, or manipulating. Muscle strength reflexes were symmetrically 2 +, and muscle strength testing was generally N-grade in both upper extremities and the right lower extremity. Strength appeared close to normal in the left lower extremity, but it was impossible to evaluate due to poor effort. Sensory testing revealed hypesthesia of the entire left lower extremity.
 
 
 13
 Range of motion of the low back was forty-five degrees of forward flexion. Claimant stopped bending due to complaints of pain. She possessed fifteen degrees of lateral bending bilaterally and ten degrees of extension with complaints of pain. She was diffusely tender to palpitation about the lower lumbosacral paraspinal muscles. In the sitting position, straight leg raising was entirely normal, but in the supine position, she complained of pain in the back and left hip at sixty degrees on the left.
 
 
 14
 X-rays of the lumbosacral spine showed contrast material still on the spinal canal, a narrowing of the L5-S1 disc space, and some minimal degenerative changes. Dr. Swartzel indicated that he found no evidence of active radiculopathy. Claimant appeared to have chronic strain of the lumbosacral spine superimposed on a narrow L5-S1 disc secondary to the previous surgery and radiculopathy. Dr. Swartzel noted that there was probably, in addition, a functional overlay. J.A. at 97-98.
 
 
 15
 On October 14, 1982, Dr. Taylor reported that she had seen Mrs. Evans on September 9, 1982. At that time, claimant was complaining of blurred vision and numbness in the left arm. Dr. Taylor described these symptoms as relatively new, and she referred claimant back to Drs. Pagani and Hunter.
 
 
 16
 At the first hearing, claimant testified that she suffered from continual back and hip pain. She stated that she could walk no further than two blocks, that sitting gave her discomfort, and that she was unable to sleep at night. In a typical day, claimant performed light housework and cooking. Although she went to the grocery store, she did not put the groceries in the car or take them out of the car. She stopped driving and did no yard work. She indicated that it was difficult for her to vacuum or to go up and down stairs.
 
 
 17
 Claimant stated that she was occasionally nervous and that her hands were weak. She indicated that although she continued to suffer from high blood pressure, her medication kept it well under control. She stated that on occasion she suffered from dizziness and blurred vision.
 
 
 18
 On the basis of this record, the Administrative Law Judge concluded that claimant was not disabled. The Appeals Council denied review of this decision, and claimant subsequently sought review in the district court. The case was referred to a Magistrate, who ordered the case remanded to the Secretary for determination of whether claimant could perform her prior work, whether she could perform a full range of sedentary work, or whether she could perform any type of substantial, gainful activity.
 
 
 19
 A supplemental hearing on remand was held before the Administrative Law Judge on February 12, 1985. A small amount of additional medical evidence was produced. A report from Dr. Luis Pagani, dated August 9, 1983, indicated that claimant was admitted to the hospital with a tentative diagnosis of right carotid transient ischemic attacks. She was placed on aspirin and Dipyridamole twice a day.
 
 
 20
 Claimant was discharged in excellent condition to be followed by Dr. Taylor. At the time of her admission to the hospital, she reported five incidents of blackouts during the past year. Claimant testified at the supplemental hearing, providing testimony consistent with that given at the first hearing.
 
 
 21
 Dr. Emily Hess, a medical adviser, testified that claimant could perform sedentary work that did not involve bending, lifting more than five pounds, and which would provide for a sit-stand option. George Parsons, Ph.D., a vocational expert, testified that claimant could do sedentary work. He stated that assuming Dr. Swartzel's and Dr. Hunter's physical capacity evaluations were accurate, claimant could perform jobs such as security guard monitor, telephone solicitor, callout clerk or industrial caller, and photomat clerk. He stated that claimant could also perform occupations in the vending industry, such as sandwich wrapper or fruit washer. He stated that if she had frequent blurry vision, she would be unable to perform any work activity. However, in the absence of frequent dizzy spells, he indicated that claimant could perform approximately 4,500 jobs existing in the regional economy.
 
 
 22
 On July 25, 1985, the Administrative Law Judge issued a recommended decision in which he found that although claimant was unable to perform her past work as a waitress, barmaid, cleaning woman, or in-store security guard, she retained the residual functional capacity to perform the jobs identified by the vocational expert at all times prior to the expiration of her insured status. The Appeals Council, with minor amendments, adopted the decision of the Administrative Law Judge.
 
 
 23
 Claimant once again sought judicial review in the district court. The case was once again referred to a Magistrate, who recommended that the decision of the Secretary be affirmed. Claimant subsequently filed a request for a remand for consideration of new medical evidence regarding amputation of her left leg. The district court referred the matter back to the Magistrate, who concluded that a remand was unnecessary because the evidence regarding claimant's transient ischemic attacks was merely cumulative. Accordingly, the Magistrate adhered to his original decision, which was affirmed by the district court.
 
 
 24
 Claimant advises us that her left leg was amputated in August 1986 as a result of the occlusive arterial disease identified by Doctors Hunter and Swartzel. However, the crucial issue for our determination is whether claimant was disabled prior to the expiration of her insured status on June 30, 1982.
 
 II.
 
 25
 In this appeal, claimant presents three issues for our consideration. First, she contends that there is not substantial evidence in the record to support the conclusion that she can perform a limited range of sedentary work. Second, she contends that the Appeals Council erred in refusing to apply 20 C.F.R. Sec. 201.00(c), Subpt.P., App. 2, to this case. Finally, she argues that a remand is necessary for further consideration of the new evidence regarding the amputation of her left leg.
 
 A.
 
 26
 The Secretary's conclusion that claimant is capable of performing a limited range of sedentary work is, of course, subject to review under the substantial evidence rule. Because claimant established a prima facie case of disability by showing her inability to perform her past relevant work, see Lashley v. Secretary of Health & Human Services, 708 F.2d 1048, 1054 (6th Cir.1983), the burden then shifted to the Secretary to show that claimant possessed the residual functional capacity to perform a significant number of jobs in the national economy. Allen v. Califano, 613 F.2d 139, 145 (6th Cir.1980).
 
 
 27
 The Secretary's determination that claimant was not disabled prior to the expiration of her insured status must be affirmed if supported by substantial evidence based upon the record taken as a whole. Garner v. Heckler, 745 F.2d 383, 388 (6th Cir.1984). On the state of any record, it is entirely possible for two different conclusions to be supported by substantial evidence. Crisp v. Secretary of Health & Human Services, 790 F.2d 450, 453 n. 4 (6th Cir.1986) (per curiam). Thus, the inquiry is not, as claimant apparently formulated it in the district court, whether substantial evidence on this record supports the conclusion that she was disabled prior to the expiration of her insured status. Rather, the inquiry is whether substantial evidence supports the Secretary's conclusion that claimant was not disabled.
 
 
 28
 We agree with claimant's contention that she need not establish complete helplessness in order to qualify for an award of benefits. See Zimbalist v. Richardson, 334 F.Supp. 1350 (E.D.N.Y.1971). We are confident that the Secretary imposed no such burden upon the claimant in this case.
 
 
 29
 Moreover, we are satisfied that the Secretary carried his burden of establishing the existence of a significant number of jobs which claimant was capable of performing prior to the expiration of her insured status. It is clear that the burden is carried once the Secretary names specific jobs in the economy that claimant can perform. See Hardaway v. Secretary of Health & Human Services, 823 F.2d 922, 928 (6th Cir.1987) (per curiam). Although the hypothetical propounded to the vocational expert did not include the limitations imposed by frequent blackouts, substantial evidence supports the conclusion that claimant did not suffer from frequent blackouts. Accordingly, inclusion of this assumption in the hypothetical was not required. See Varley v. Secretary of Health & Human Services, 820 F.2d 777, 780 (6th Cir.1987). Accordingly, we agree with the Secretary that substantial evidence supports the determination that claimant was capable of performing a limited range of sedentary work prior to the expiration of her insured status.
 
 B.
 
 30
 Claimant next argues that the Appeals Council erred in refusing to apply section 201.00(c) of Appendix 2 to the present case. This rule provides in relevant part:
 
 
 31
 Inability to engage in substantial gainful activity would be indicated where an individual who is restricted to sedentary work because of a severe medically determinable impairment lacks special skills or experience relevant to sedentary work, lacks educational qualifications relevant to most sedentary work (e.g., has a limited education or less) and the individual's age, though not necessarily advanced, is a factor which significantly limits vocational adaptability.
 
 
 32
 We agree with the Appeals Council that this rule does not apply to claimant's case. In a similar context, this court has held that Rule 201.00 does not apply in cases in which a non-guideline determination is made. Varley, 820 F.2d at 782. Rule 201.00 is contained in the grid and governs application of the grid, but not non-grid determinations.
 
 
 33
 Additionally, even if we were to find that the rule should be applied to a non-guideline determination, it clearly was not designed for the benefit of claimants like Mrs. Evans. The rule contemplates that a claimant's age must be a factor significantly limiting vocational adaptability. Claimant was only forty-six years of age, classified as a "younger individual," at the time her insured status expired. Under these circumstances, claimant's age would not be a factor significantly limiting vocational adaptability within the meaning of the Rule. Accordingly, the Appeals Council was correct in refusing to apply Rule 201.00 to this case.
 
 C.
 
 34
 Finally, claimant argues that she is entitled to a remand to the Secretary for further consideration of the evidence regarding the amputation of her leg. She relies on Cassel v. Harris, 493 F.Supp. 1055 (D.Colo.1980), in which the court concluded that benefits should be granted when a disabling impairment has its inception, although not its disabling effect, prior to the expiration of the insured status. Claimant contends that, because she apparently suffered from an impairment of her left leg prior to the expiration of insured status, and because the ultimate result of this disability was amputation, she should be entitled to a remand.
 
 
 35
 The Cassel opinion has met with disfavor and clearly does not reflect the law of this Circuit. This court has consistently held that a claimant must establish the existence of a disabling impairment prior to the expiration of insured status. See, e.g., Siterlet v. Secretary of Health & Human Services, 823 F.2d 918 (6th Cir.1987) (per curiam); Gibson v. Secretary of Health, Education & Welfare, 678 F.2d 653 (6th Cir.1982).
 
 
 36
 In the present case, claimant must establish that her impairments were disabling before June 30, 1982. As discussed above, substantial evidence in the record as a whole indicates that her condition was not disabling before that date. Accordingly, we conclude that a remand for consideration of the evidence regarding claimant's leg amputation is not warranted.
 
 III.
 
 37
 After careful consideration, we conclude that the decision of the Secretary is supported by substantial evidence. Accordingly, for the foregoing reasons, the judgment of the district court denying claimant's application for disability benefits is AFFIRMED.